OCT 25 2024 PM 3:43
FILED-USDC-CT-NEW HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR DEVICES; 392 NEWHALL STREET, NEW HAVEN, CONNECTICUT; AND PERSON OF PARIS HUCKABY | Case No.   3:24-mj-959 (MEG)<br><br>**Filed Under Seal** |

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS AND ORDERS PURSUANT TO 18 U.S.C §§ 3122 AND 3123</u>

I, Ryan Halpin, being first duly sworn, hereby depose and state as follows:

## I.     **REQUESTED AUTHORIZATIONS**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 authorizing search warrants for the following cellular device and persons:

    a.  Cellular device described as a light blue iPhone with a see-through cover, cracked screen, and stickers affixed on the rear of the case. (hereinafter **"SUBJECT DEVICE 1"**), which is believed to be used by Matthew SANTOS, which is currently in the possession of the FBI.

    b.  **SUBJECT PREMISES** located at 392 Newhall Street, New Haven, Connecticut. As set forth herein, **SUBJECT PREMISES** is believed to be the primary residence of PARIS HUCKABY, and, based on information developed during the investigation, as described herein, where she stores narcotics and proceeds of drug trafficking.

    c.  Person of PARIS HUCKABY, more particularly described in Attachment A-2 for items described in Attachment B-2.

    d.   Cellular device with assigned call number (860) 268-6533, utilized by PARIS HUCKABY in furtherance of the Target Narcotics Offenses ("**SUBJECT DEVICE 2**"); and

    e.   Cellular device with assigned call number (203) 506-6272, utilized by PARIS HUCKABY in furtherance of the Target Narcotics Offenses ("**SUBJECT DEVICE 3**").

2.      Based on the facts contained in this Affidavit, I submit that there is probable cause to believe and I do believe that the requested search warrants will reveal evidence, instrumentalities, contraband, or fruits of violations of federal law by MATTHEW SANTOS (hereafter, "SANTOS"), the holder of **SUBJECT DEVICE 1**, LINDSEY EDWARDS, (hereafter, "EDWARDS"), PARIS HUCKABY (hereafter, "HUCKABY"), the holder of **SUBJECT DEVICES 2** and **3**, and resident of the **SUBJECT PREMISES**, and others, specifically, violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); 18 U.S.C. §§ 933(a)(1), (a)(2) (Trafficking in Firearms); 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy) (collectively, the "Target Firearm Offenses"); 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (collectively the "Target Narcotics Offenses," and together with the "Target Firearm Offenses," the "Target Offenses").

3.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of search and seizure warrants, I have not included each and

every fact known to me regarding this investigation.  Rather, I have set forth only those facts that

I believe are sufficient to establish probable cause.

4.    The Court has jurisdiction to issue the proposed warrant because it is a "court of

competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C.

§ 2711(3)(A)(i).

## II.    AGENT TRAINING & BACKGROUND

5.    I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to

conduct investigations and to make arrests for offenses enumerated in Title 18, United States

Code, Section 2516. I am a "federal law enforcement officer" within the meaning of the Federal

Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce

criminal laws as duly authorized by the Attorney General to request a search warrant.

6.    I am a Special Agent with the Federal Bureau of Investigation and have been

employed as such since August 2019. I attended the Basic Field Training Course at the FBI

Academy in Quantico, Virginia. I am currently assigned to the New Haven Division of the FBI,

where I have been tasked with investigating violent criminal street gangs and organized criminal

enterprises involving the smuggling, distribution, and sale of illegal drugs. Prior to becoming an

FBI Special Agent, I was a police officer for seven years. As a police officer, I investigated

numerous crimes, including drug dealing/distribution and firearms-related offenses. In

connection with my experience as a police officer and a Safe Streets and Violent Crimes Agent, I

have coordinated controlled purchases of illegal drugs utilizing cooperating sources; conducted

electronic and physical surveillance of individuals involved in organized criminal activity;

analyzed records documenting the purchase and sale of illegal drugs and other items; and debriefed cooperating sources and drug distributors, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by organized criminal enterprises. I have participated in investigations of diverse crimes, including investigations where phone records were obtained. As a member of the Task Force, I have participated in narcotics-related investigations resulting in state and federal convictions of individuals for narcotics trafficking offenses. I have also helped coordinate controlled purchases of controlled substances utilizing confidential sources. I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances. I have analyzed records documenting the illegal purchase of and sale of controlled substances. I have assisted in debriefing cooperating sources and drug distributors, as well as other local, state, and federal law enforcement.

7.      Based on my training and experience, I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons or businesses and prepaid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate, and utilize, all of which is done to avoid detection and thwart the efforts of law enforcement.

4

8.    Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in firearms and narcotics trafficking activities:

a.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

b.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

d.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said device/s; and,

5

h.  internet browsing history, to include, internet searches in the memory of said
device/s.

III.  **PROBABLE CAUSE**

9.  Since May 2024, the FBI New Haven Safe Streets and Gangs Task Force
("NHSSGTF") has been investigating a drug and firearms trafficking organization led by
EDWARDS (hereafter, "EDWARDS DTO"). Investigators received information from a
confidential source alleging that EDWARDS is a largescale distributor of narcotics.
Investigators conducted physical surveillance on EDWARDS and observed EDWARDS
conducting hand-to-hand drug transactions. As detailed below, EDWARDS conducted street-
level deals of "E-pills", which field tests have shown contain fentanyl compound and/or
methamphetamine. During the investigation, investigators identified HUCKABY as a member of
the EDWARDS DTO and distributor of narcotics. As detailed herein, investigators believe that
HUCKABY also receives shipments of and stores illegal narcotics at the **SUBJECT
PREMISES** on behalf of the EDWARDS DTO.  As described below, information and evidence
have also been obtained that reflects that HUCKABY was using **SUBJECT DEVICES 2 and 3**
to commit the Target Offenses.

10.  Additionally, during the course of the narcotics investigation, investigators
determined that EDWARDS was also trafficking firearms with SANTOS and others known and
unknown to law enforcement. As described below, information and evidence have also been
obtained that reflects that SANTOS was using **SUBJECT DEVICE 1** in connection with
EDWARDS to commit the Target Offenses.

6

**EDWARDS and Gun Trafficking Investigation**

*Controlled buy of Beretta firearm during week ending on October 5, 2024*

11.    During the week ending with October 5, 2024, at the direction of investigators, CHS-1[1] made contact with EDWARDS via his cell phone assigned the phone number 475-439-4955[2] (the "Edwards Device") and arranged to purchase a handgun from EDWARDS. CHS-1 also exchanged messages with EDWARDS through a Telegram[3] account used by EDWARDS associated with the same phone number as -4955.

12.    Based on my training and experience, I know that firearms and narcotics traffickers often leverage social media and encrypted messaging platforms like Telegram to conduct and promote their business while evading detection from law enforcement. In order to keep their customers aware of how to make inquiries and purchases, I know that firearms and narcotics traffickers commonly advertise their social media account(s) on their encrypted messaging account and vice versa.

---

[1] Confidential Human Source is a term used to describe those who have gone through a vetting process by the FBI and have proved confidential and reliable. CHS-1 has provided information to investigators that has been corroborated by other investigative means and has proven reliable. CHS-1 is receiving monetary compensation for his/her assistance.

[2] On October 18, 2024, the Honorable U.S. Magistrate Judge Maria E. Garcia authorized a searched warrant to search the Edwards Device.

[3] [3] Telegram Messenger, commonly known as Telegram, is an encrypted, cloud-based, cross-platform instant messaging service. As of September 24, 2024, if Telegram receives a valid order from the relevant judicial authorities that confirms a suspect in a case involving criminal activities that violate the Telegram Terms of Service, Telegram will perform a legal analysis of the request and may disclose the subject's IP address and phone number to the relevant authorities. If any data is shared, Telegram will include such occurrences in a quarterly transparency report published at: https://t.me/transparency.  However, to date, it is my understanding and belief that Telegram will not provide content of communications.

13.     A review of the Telegram conversation between CHS-1 and EDWARDS prior to the transaction revealed that EDWARDS used a Telegram Account with the username, "G" (hereafter referred to as "EDWARDS Telegram Account"). The EDWARDS Telegram Account sent CHS-1 a screenshot of an additional firearm, followed with the message, "Beretta Glock 19 Glock 17." EDWARDS then messaged via Telegram, "Beretta a band the glocks more because they got ladders and them the best guns in the world right now".  In my training and experience, I understand EDWARDS to be advising the CHS-1 that the Beretta will cost a "band," and that "glocks," i.e. Glock-manufactured firearms, are more expensive due to their quality and because they have "ladders," to which extended magazines are referred. I know, based on my training and experience, that a "band" is a common term used for $1,000 and "ladder" is a common term used for an extended 30 round magazine.

14.     Investigators searched CHS-1 for money and contraband with negative results. Investigators provided CHS-1 with U.S. Government funds to complete the controlled purchase. Investigators equipped CHS-1 with an audio and video recording device to capture the transaction with EDWARDS. CHS-1 departed from investigators to meet EDWARDS at the agreed upon location. While conducting surveillance, Investigators observed a Dodge Durango, known to be used by EDWARDS, (hereafter, "Suspect Durango") arrive at the agreed upon location. Soon after, EDWARDS was observed by surveillance units exiting the Suspect Durango.

15.    EDWARDS approached CHS-1's vehicle then walked towards a nearby business. Soon after, a white Toyota Camry, bearing Connecticut registration AD78475[4] (hereinafter, the "Suspect Camry"), arrived at the transaction location. Surveillance units observed EDWARDS briefly enter the vehicle, then exit the vehicle and retrieve a bag from the trunk. EDWARDS then walked to the CHS-1's vehicle and leaned into the passenger side of the vehicle with the bag. CHS-1 then departed the area. Surveillance units observed the Camry depart the area soon after. Surveillance units followed the Camry from the transaction location to an address in Bristol, Connecticut where the surveillance operation was terminated. Investigators identified the operator as Matthew SANTOS (YOB 2004) as he exited the driver seat of the vehicle. An additional male party, matching the physical description of Anthony Primavera (YOB UNKNOWN), who was a suspect in a robbery in the City of Waterbury, was observed approaching the Suspect Camry.

16.    Based on my training and experience, and knowledge of this investigation, I believe that EDWARDS went to the Suspect Camry to obtain the Beretta firearm (as described below), which he then brought and sold to CHS-1.

17.    Following the controlled buy, CHS-1 met investigators at a pre-arranged location and turned over a Beretta handgun with an empty magazine. CHS-1 stated that he/she purchased the handgun from EDWARDS with the provided U.S. Government funds. Investigators searched CHS-1 for money and contraband with negative results. Investigators also took possession of the audio and video recording device.

_____

[4] Connecticut Registration AD 78475 is registered to a 2014 Toyota Camry, Fior Santos, 43 Mathews Street, Waterbury, Connecticut.

*Controlled buy of Polymer 80 Firearm during week ending on October 12, 2024*

18.    During the week ending with October 12, 2024, at the direction of the investigators, CHS-1 made contact with the EDWARDS and arranged to purchase "E-pills" and a handgun from EDWARDS. CHS-1 also exchanged messages with EDWARDS through a Telegram account used by EDWARDS.

19.    A review of the Telegram conversation between CHS-1 and the EDWARDS Telegram Account revealed that EDWARDS sent CHS-1 a screenshot, which appeared to be a Telegram message exchange between the EDWARDS Telegram Account and another Telegram Account with the username, "Whiteboy". A review of the message exchange revealed that a message, believed to have been sent by the EDWARDS Telegram Account to the "Whiteboy" account, stated "But send pictures of the other ones still I might grab one."  In response the "Whiteboy" account messaged, "12 tm?" and "Or 12 tn".  Based on my training and experience, I believe that EDWARDS and "Whiteboy" were trying to determine a meeting time. "Whiteboy" further messaged EDWARDS that "[his] mans mom on break and needa scoope her to get food..."  which I understand to mean "Whiteboy" literally was bringing somebody to get food. EDWARDS also forwarded to CHS-1 a video of a male that appeared similar in appearance to SANTOS, holding a black firearm, which I believe appeared to be a Colt 1911 firearm. EDWARDS later had a Telegram conversation with CHS-1 attempting to sell a 1911 ("But it's a 1911 blacced out around...").

20.    I believe, based on my training and experience, and observations made during the October 4, 2024 controlled purchase of a firearm, that the Telegram account with the username of "Whiteboy" is being utilized by SANTOS and/or other persons known and unknown to law enforcement to coordinate the firearm transaction with EDWARDS during the week ending with

October 12, 2024. A recent review of the Edwards Device shows that the Telegram user

"Whiteboy" stored on the Edwards Device is associated with a phone number that law

enforcement know, through law enforcement databases, to be associated with an individual

named Anthony Primavera, who law enforcement believe resides with SANTOS.  Based on the

Telegram communications between EDWARDS and "Whiteboy," and SANTOS' involvement

and presence at the two controlled buys of firearms from EDWARDS, I believe that SANTOS is

either utilizing the "Whiteboy" Telegram account or communicating with it (either through

Telegram or another means) to facilitate the firearm trafficking, and that records of such

communications will be found on **SUBJECT DEVICE 1**.

21.     After sending the screenshot to CHS-1, EDWARDS messaged CHS-1 again via

Telegram, "Basically he say can it be around 1" and "I just want like 75 more for the light. I can

throw a extra mag to for a extra 25 if he want". CHS-1 responded via Telegram, "Yea next time

I'll grab another if it comes around" and "Yea 1 is straight too".

22.     On the date of the controlled buy, investigators searched CHS-1 for money and

contraband with negative results. Investigators provided CHS-1 with U.S. Government funds to

complete the controlled purchase. Investigators again equipped CHS-1 with an audio and video

recording device to capture the transaction with EDWARDS. CHS-1 departed from investigators

to meet EDWARDS at the agreed upon location. While conducting surveillance, Investigators

observed Suspect Durango park in the area of the agreed upon transaction location. Surveillance

units observed EDWARDS exit the Suspect Durango and enter a nearby business.

23.     Surveillance units observed the same Suspect Camry, being operated by

SANTOS, arrive in the area of the transaction location. CHS-1 arrived at the area of the agreed-

upon transaction location soon after. Surveillance units observed EDWARDS approach the

11

CHS-1's vehicle and open the front passenger door and lean inside. EDWARDS then walked to his Suspect Durango and entered the front passenger seat. Soon after, EDWARDS approached the front passenger side of the Suspect Camry and appeared to engage in a hand-to-hand exchange, then retrieved a white bag out of the Suspect Camry. EDWARDS then walked to the CHS-1's vehicle, opened the front passenger door, then leaned into the vehicle. Based on my training and experience, and knowledge of this investigation, I believe that EDWARDS went to the Suspect Camry to obtain the Polymer 80 firearm (as described below), which he then brought and sold to CHS-1.

24.    CHS-1 then departed the area. Surveillance units observed the Suspect Camry depart the area soon after. Surveillance units followed the Suspect Camry from the transaction location to a residence on Willow Street in Waterbury, Connecticut. Surveillance units observed SANTOS exit the Suspect Camry then walk to the front porch of a residence. SANTOS appeared to be using a cell phone while on the porch. SANTOS then climbed through the window of the residence. Soon after, SANTOS exited the residence and returned to the Suspect Camry before departing the area.

25.    Surveillance units observed the Suspect Camry travel to a business in Waterbury. Surveillance units were unable to observe his activities at the business; however, soon after the Suspect Camry departed, and surveillance units observed an unidentified, older female in the front passenger seat of the Camry. The Suspect Camry was followed to a restaurant in Waterbury where the unidentified female exited the Suspect Camry then entered the restaurant. Soon after, the unidentified female exited the restaurant then reentered the Suspect Camry. Investigators know this to be consistent with the message from "Whiteboy" to the EDWARDS Telegram Account that was forwarded to CHS-1, as mentioned above ("my mans mom on break

and needa scoope her to get food...”). Surveillance units followed the Suspect Camry to a residence on Matthews Street, Waterbury in the immediate vicinity of where the registered owner of the Suspect Camry is registered to. The surveillance operation was terminated.

26.    Following the controlled buy, CHS-1 met investigators at a pre-arranged location and turned over seven plastic bags with pills of various colors, a polymer 80 “ghost” gun with no visible serial number, ammunition, and an empty magazine. CHS-1 stated that he/she purchased the pills and the firearm from EDWARDS with the provided U.S. Government funds. Investigators searched CHS-1 for money and contraband with negative results. Investigators also took possession of the audio and video recording device. The “E-pills” field tested positive for fentanyl compound and/or methamphetamine and weighed approximately 236.5 grams including packaging. Drug Enforcement Administration (DEA) Laboratory testing on the seized pills is still pending.

27.    The polymer 80 handgun, *inter alia*, was swabbed for DNA and samples were preserved in evidence storage. I have probable cause to believe and do believe that the DNA evidence collected from SANTOS will match DNA evidence collected from the polymer 80 handgun recovered during the previously detailed controlled purchase. I believe that the evidence will further establish SANTOS’ participation in the conspiracy, in violation of 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); 18 U.S.C. §§ 933(a)(1), (a)(2) (Trafficking in Firearms); 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy).

28.    On October 18, 2024, the Honorable U.S. Magistrate Judge Maria Garcia authorized search warrants to search SANTOS’ person and to obtain DNA from his mouth. On October 23, 2024, at approximately 12:45 P.M., investigators executed the search warrants at 43 Matthews Street, Waterbury, Connecticut (hereafter, “Santos Residence”). Investigators made

contact with SANTOS' mother, outside of the Santos Residence. SANTOS' mother allowed investigators to enter the SANTOS RESIDENCE where SANTOS was located in a second-floor bedroom. SANTOS exited his bedroom and met with investigators. SANTOS was verbally advised of his Miranda Rights, which he acknowledged and confirmed he understood. Subsequently, an investigator exited the search warrant for the DNA of SANTOS via buccal swabs. An investigator asked SANTOS' mother if she knew the location of her son's cell phone. SANTOS indicated it was in SANTOS' bedroom, retrieved SANTOS's phone (i.e., the **SUBJECT DEVICE 1**), and handed it to an investigator. SANTOS voluntarily provided investigators with the passcode to unlock **SUBJECT DEVICE 1**. I believe, based on my training and experience, that there is evidence of gun trafficking on **SUBJECT DEVICE 1**.

### EDWARDS and the Ongoing Narcotics Trafficking Investigation

29.     As noted above, investigators began investigating the EDWARDS DTO based on suspected drug trafficking activity, which expanded into an investigation into firearms trafficking.  Below are examples of controlled narcotics purchases into the EDWARDS DTO that were conducted prior to the firearms purchases, which are set forth to establish probable cause to search the **SUBJECT PREMISES**, as described in Attachment A-2, for the items described in Attachment B-2, the person of HUCKABY, as described in Attachment A-3, for the items described in Attachment B-3, and to search **SUBJECT DEVICE 2** and **SUBJECT DEVICE 3**, as described in Attachments A-4 and A-4, for the items described in Attachments B-4 and B-5.

*Controlled buy of fentanyl compound and/or methamphetamine during week ending on June 14, 2024*

14

30.     During the week ending on June 14, 2024, CHS-2[5] contacted EDWARDS via Facebook. EDWARDS told CHS-2 to contact him on a new cell phone number, 475-439-4955 (referred to herein as the "Edwards Device").

31.     During the week ending with June 14, 2024, at the direction of, and under the supervision of the investigators, CHS-2 called the Edwards Device and arranged to purchase the same "E-pills" from EDWARDS. Investigators searched CHS-2 for money and contraband with negative results. Investigators provided CHS-2 with U.S. Government funds to complete the controlled purchase. Investigators equipped CHS-2 with an audio and video recording device to capture the transaction with EDWARDS. CHS-2 departed from investigators to meet EDWARDS at the agreed upon location. While conducting surveillance, Investigators observed the Suspect Durango pull into the parking lot of the meet location. A few minutes later, the Suspect Durango exited the parking lot.

32.     Following the controlled buy, CHS-2 met investigators at a pre-arranged location and turned over six plastic bags with pills of various colors. CHS-2 purchased these pills from EDWARDS with the provided U.S. Government funds. Investigators searched CHS-2 for money and contraband with negative results. Investigators also took possession of the audio and video recording device. The "E-pills" field tested positive for fentanyl compound and/or

---

[5] CHS-2 has provided information to investigators that has been corroborated by other investigative means and has proven reliable. CHS-2 is receiving monetary compensation for his/her assistance. CHS-2 has a criminal history that includes prior convictions for: Violation of a protection order (class D felony), Assault 2nd (class D felony), Unlawful restraint 1st (class D felony), Criminal Mischief 1st (class D felony), Robbery 2nd (class C felony), Larceny 3rd (class D felony), and numerous misdemeanor charges to include Assault, Harassment, probation violations, criminal mischief, and others.

methamphetamine and weighed 181 grams including packaging. Drug Enforcement

Administration (DEA) Laboratory testing on the seized pills is still pending.

***Controlled buys of fentanyl compound and/or methamphetamine from HUCKABY during weeks ending on August 30, 2024 and September 7, 2024***

33.    During the week ending on August 30, 2024, CHS-1 arranged a controlled buy

from EDWARDS by contacting the Edwards Device under the supervision of investigators.  As

per protocol, CHS-1 met with investigators prior to the buy and was searched for contraband

with negative results. CHS-1 was equipped with audio and video recording equipment, and

traveled to the pre-arranged meeting location.  At the meeting location, CHS-1 met with

EDWARDS and observed HUCKABY who was sitting in the passenger seat of the Suspect

Durango, and purchased a quantity of "E-pills."  Following the controlled buy, CHS-1 met

investigators at a pre-arranged location and turned pills of various colors. The "E-pills" field

tested positive for fentanyl compound and/or methamphetamine and weighed approximately 629

grams including packaging. Drug Enforcement Administration (DEA) Laboratory testing on the

seized pills is still pending.

34.    During the week ending with September 7, 2024, at the direction of, and under

the supervision of the investigators, CHS-1 called the telephone number (860) 268-6533

(hereafter, "**SUBJECT DEVICE 2**"), which is utilized by HUCKABY. **SUBJECT DEVICE 2**

had been provided to CHS-1 by EDWARDS prior to this date.  EDWARDS provided

HUCKABY's contact to CHS-1 so that the CHS-1 could provide narcotics on EDWARDS'

behalf while he was away on vacation. CHS-1 knew the user of the **SUBJECT DEVICE 2** to be

someone EDWARDS referred to as his "Shorty."

35.    CHS-1 made contact with Edwards' "Shorty," whom investigators identified as HUCKABY, and arranged to meet with her at a location in New Haven to purchase the same "E-pills" on behalf of EDWARDS. Investigators searched CHS-1 for money and contraband with negative results. Investigators provided CHS-1 with U.S. Government funds to complete the controlled purchase. Investigators equipped CHS-1 with an audio and video recording device to capture the transaction with HUCKABY. CHS-1 departed from investigators to meet HUCKABY at the agreed upon location.

36.    Investigators conducting surveillance observed HUCKABY exit the **SUBJECT PREMISES** and enter a Honda Accord bearing Connecticut registration BB64497 (hereafter, "Suspect Honda"). HUCKABY was followed to the agreed upon location. The CHS-1 was observed arriving to the agreed upon location. Soon after, the Suspect Honda departed the agreed upon location and arrived back at the **SUBJECT PREMISES** approximately two minutes later.

37.    Following the controlled buy, CHS-1 met investigators at a pre-arranged location and turned over 23 plastic bags with pills of various colors. CHS-1 purchased these pills from HUCKABY with the provided U.S. Government funds. The CHS-1 was shown a photograph of HUCKABY and believed that to be the person that sold CHS-1 the pills. Investigators searched CHS-1 for money and contraband with negative results. Investigators also took possession of the audio and video recording device. The "E-pills" field tested positive for fentanyl compound and/or methamphetamine and weighed 760 grams including packaging. DEA Lab testing confirmed the presence of methamphetamine in the pills with a net weight of 746 grams.

### *Review of EDWARDS DEVICE*

38.    As detailed in Footnote 5, on October 18, 2024, the Honorable U.S. Magistrate Judge Maria E. Garcia authorized a searched warrant to search the **EDWARDS DEVICE**. A

review of the **EDWARDS DEVICE** has revealed that EDWARDS and HUCKABY worked

together to traffic illegal narcotics. Additionally, as detailed herein, I believe, based on my

training and experience, that HUCKABY received shipments of illegal narcotics and stored

illegal narcotics at the **SUBJECT PREMISES**.

39.     For example, a review of the **EDWARDS DEVICE** revealed a conversation

between EDWARDS and telephone number (203) 506-6272[6], labeled "P", and believed to be

used by HUCKABY (hereafter, "**SUBJECT DEVICE 3**") on October 19, 2023.  On this date,

the **SUBJECT DEVICE 3** messaged the Edwards Device, "I just checked the usps it's still

saying the same thing and I refreshed the page and re put the tracking number in". The Edwards

Device replied, "Text me when you land".  I believe, based on my training and experience, that

HUCKABY updated EDWARDS on the shipping status of a U.S. Postal Service package

containing a shipment of narcotics. Later, the **SUBJECT DEVICE 3** messaged the Edwards

Device, "I'll check on your package again when I get to the resort, Ebony said she stopped by

my house in the morning and it wasn't there". I believe that "my house" was a reference to the

**SUBJECT PREMISES,** and that "Ebony" was stopping by **SUBJECT PREMISES** to retrieve

the USPS parcel on behalf of EDWARDS and HUCKABY.  The **SUBJECT DEVICE 3**

messaged the Edwards Device, "Still the same thing in atl," in response to the Edwards Device

requesting, "What the site saying." Based on my training and experience the "atl" referred to

Atlanta, where the package was coming from and where I believe EDWARDS to be obtaining

re-supplies of narcotics.  Based on my training and experience, and knowledge of this

_____

[6] A query of CashApp for telephone number (203) 506-6272 revealed a publicly viewable profile for "Paris Renee" with the username of $ParisR25.

investigation, I believe that EDWARDS is directing shipments of narcotics from Atlanta, sent via USPS, to the **SUBJECT PREMISES** and storing narcotics there for re-distribution.

40.     Investigators identified another example of EDWARDS and HUCKABY discussing narcotics transactions in a separate conversation on the Edwards Device with telephone number 860-268-6533 **(SUBJECT DEVICE 2),** which is also believed to be with HUCKABY. The Edwards Device listed this contact as "Paris Renee."  Specifically, on June 28, 2024, the Edwards Device and the **SUBJECT DEVICE 2** had a conversation indicating that EDWARDS was sending someone (whom investigators believe to be a drug customer) to meet with HUCKABY. The **SUBJECT DEVICE 2** replied, "Tell him to come to 383 Newhall Street," and "Ok but I just have the address across the stret from my house so I don't have to meet up with him." EDWARDS responded, "Ok look at you," "You acting like a seasoned vet."

41.     Based on my training and experience, I know that 383 Newhall Street is a across the street from the **SUBJECT PREMISES.** I also believe that EDWARDS was conducting a drug deal through HUCKABY and HUCKABY wanted to distance herself from her home address without having to travel far to conduct the deal.

42.     Investigators observed a simultaneous conversation between the Edwards Device and a telephone number known to me ending in -5752, hereinafter referred to as the -5752 Telephone ("-5752 telephone"). The -5752 Telephone texted, "She gotta another pack for me," and the Edwards Device replied, "Only thing bro I'm about to re so I need cash on deck I can do a buck." Based on my training and experience, I believe that the user of the -5752 Telephone was asking whether "she," referring to HUCKABY, had another "pack" (narcotics) for him/her and EDWARDS was conveying that he needs cash because he is about to "re-up," or "re-supply" his store of narcotics. From the Edwards Device, EDWARDS then provided the address to **-5752**

19

**Telephone**, "383 Newhall St." across the street from the **SUBJECT PREMISES**, which I believe was EDWARDS directing the user of the -5752 Telephone to HUCKABY to purchase narcotics.

***Suspicious Parcel Delivery from Atlanta to the SUBJECT PREMISES***

43.     On October 24, 2024, investigators learned through confidential sources that EDWARDS had received a re-supply shipment of pills. Investigators contacted a member of the U.S. Postal Inspection Service. A database check of shipping records associated with the **SUBJECT PREMISES** revealed that an approximate 10-pound package from Atlanta was delivered to the **SUBJECT PREMISES** on October 23, 2024, at approximately 10:49 a.m.  As noted above, investigators identified a prior text communication between EDWARDS and HUCKABY about the shipment of a parcel for EDWARDS from Atlanta to the **SUBJECT PREMISES**.  I believe, based on my training and experience, that illegal narcotics were shipped to the **SUBJECT PREMISES** on October 23, 2024, on behalf of the EDWARDS DTO.

**Electronic Storage and Forensic Analysis of the SUBJECT DEVICES**

44.     The warrant applied for the **SUBJECT DEVICES** would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

45.     With respect to **SUBJECT DEVICE 1**, as detailed in paragraphs 20 through 34, I believe that SANTOS utilized the **SUBJECT DEVICE 1**, including by utilizing Telegram, to coordinate the sale of two firearms to CHS-1. To date, it is my understanding and belief that Telegram, with a valid order, will disclose IP addresses and phone numbers associated with an account. However, to date, it is my understanding and belief that Telegram will not provide content of communications. Therefore, I believe that seizing and searching the **SUBJECT**

**DEVICE 1** is the only investigative option available to law enforcement to obtain evidence of the Target Offenses without the cooperation of EDWARDS and/or SANTOS.

46.     As described above and in Attachments B-1, B-4 and B-5, the undersigned Affiant seeks permission to search and seize evidence that the **SUBJECT DEVICES** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

47.     Searching for the evidence described in Attachments B-1, B-4 and B-5 may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B-1 or perusing all stored information briefly to determine whether it falls within the scope of the warrant. Considering these difficulties, FBI, or other law enforcement agency, intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachments B-1, B-4 and B-5.

48.    Based on my training and experience, as well as information asserted herein, there is probable cause to believe, and I do believe, that within the **SUBJECT DEVICES** there will be found items which constitute evidence of the crimes of the Target Offenses.

49.    Based on my training, experience, I also know that the **SUBJECT DEVICES** may have some or all of the capabilities that allow each phone to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA).  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

50.    With regards to the **SUBJECT DEVICES**, I request permission to seize and search the **SUBJECT DEVICES** for evidence relating to the Target Offenses.

51.    Based on my training and experience, and as set forth in this affidavit, I know wireless telephones are used by co-conspirators to communicate efforts to conduct criminal activities and it is likely that the **SUBJECT DEVICES** was used by SANTOS and/or HUCKABY to communicate with co-conspirators regarding the Target Offenses. Furthermore, based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of text communications between co-conspirators who distribute narcotics, or conspire to do so. Also based on my training and experience, I know that internet-browsing history in wireless phones can contain evidence of internet searches for locations and addresses used for storing and distributing narcotics. Also based on my training and experience, wireless phones may contain videos and images of co-conspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics, as well as shipping packages within which the narcotics

22

are concealed. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

    a.  the telephone number, ESN number, IMEI number, other identifying number, serial number, and SIM card number of said telephone;

    b.  the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.  any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

    g.  saved searches, locations, and route history in the memory of said devices;

    h.  internet browsing history, to include, internet searches in the memory of said device; and

       i.   images and videos in the memory of said device.

52.     It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

53.     It is also requested that the warrant be deemed executed once the items listed in Attachment B-1, B-4, and B-5 have been extracted from the phone and that further analysis of the seized items be permitted at any time thereafter.

54.     It is also requested that stored electronic information, data, information and images contained in the **SUBJECT DEVICES** may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

## **General Information Regarding Drug Trafficking**

55.    During my tenure as a law enforcement officer, I have investigated and participated in operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking and related offenses. Search warrants relating to these investigations have covered, among other locations, residences, vehicles, businesses, stash locations and distribution locations used by drug traffickers and their coconspirators.

56.    Materials searched for and recovered in these locations have included, among other evidence, the following: controlled substances; drug paraphernalia, such as scales, processing materials and packaging materials; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses and telephone numbers of coconspirators; sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones; computers, computer disks and answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained during the executions of said search warrants, have constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

57.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

     a.    drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.  drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

c.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

e.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, I-Pads or other computerized tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

f.  drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.  drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

h.  drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

i.  drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

j.  drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

k.  drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency,

27

firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

l.  drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

m. persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

n.  drug traffickers often have photographs, slides, or video movies of themselves, their coconspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession or residence;

o.  The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity.  However it is common for drug traffickers to travel to other states that are considered major distribution centers to purchase their narcotics for distribution.  It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers.  It is known that drug traffickers' methods include, but are not limited to:  commercial airlines, private motor

vehicles, tractor trailer units, public transportation, and motor vehicles with

concealed compartments, and government and contract mail carriers.  It is known

that the residences of drug traffickers will often contain records of drug related

travel.  These records may include airline ticket receipts, credit card receipts,

rental car receipts and luggage tags reflecting points of travel;

p.  based on my training and experience, drug traffickers commonly have firearms

and other weapons in their possession, in their cars, on their person, at their

residence including, but not limited to handguns, rifles, shotguns, automatic

weapons, and knives.  These firearms and weapons are most often kept to protect

and secure drug traffickers' property;

q.  based on my training, experience and participation in this and other drug

trafficking investigations, I know that it is generally a common practice for drug

traffickers to store their drug inventory and drug related paraphernalia in their

residences, cars or those of trusted associates.  This paraphernalia frequently

includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and

dilutant;

r.  based on my training and experience, drug dealers often create secret locations,

commonly called "traps," in their automobiles.  Often, drug dealers will use these

automobiles to store narcotics, weapons, money and other items and documents

related to their drug trade; and

s.  based on my training, experience and participation in this and other drug

trafficking investigations, I know that drug traffickers often possess, maintain and

control other items related to their drug trafficking activities, as described in

29

Attachment A to this affidavit, in their cars, homes, garages and outbuildings, and in safes or lock boxes maintained at such locations.

## EXECUTION OF THE WARRANTS

58.     The undersigned respectfully requests express authorization to execute the warrants sought herein at any time of the day or night and believes, based upon the information contained herein, such authorization is supported by good cause.

## SEALING AND CONCLUSION

59.     It is further requested that this affidavit be filed under seal until further order of the Court as the investigation is continuing, and, it is my belief that, based upon the details of the investigation set forth herein, disclosure at this time could compromise the safety of cooperating sources listed herein, law enforcement authorities conducting the investigation and those who will affect the anticipated arrests and searches, and the ongoing investigation itself, by, including but limited to, causing Subjects to flee or destroy evidence if they were to be alerted to the contents of this affidavit.

60.     Based on the forgoing, I request that the Court issue the proposed search warrants.


Respectfully submitted,


RYAN HALPIN
SPECIAL AGENT, FBI


Subscribed and sworn to me in accordance with Fed. R. Crim. P. 4.1 ~~over the telephone~~ *in person* or other
reliable means on October 25, 2024

30

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to be Searched (SUBJECT DEVICE 1)

**SUBJECT DEVICE 1** is a light blue iPhone with a see-through cover, cracked screen, and stickers affixed on the rear of the case, which is believed to be used by Matthew SANTOS, which is currently in the possession of the FBI.

This warrant authorizes the forensic examination of the **SUBJECT DEVICE** for the purpose of identifying the electronically stored information described in Attachment B-1.

**ATTACHMENT B-1**

DESCRIPTION OF THINGS TO BE SEIZED (**SUBJECT DEVICE 1**)

All records and information contained in the **SUBJECT DEVICE 1** pertaining to violations of federal law, specifically, violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm); 18 U.S.C. § 922(d)(1) (Sale of Firearm to a Convicted Felon); 18 U.S.C. §§ 933(a)(1), (a)(2) (Trafficking in Firearms); 18 U.S.C. § 933(a)(3) (Firearms Trafficking Conspiracy); 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Offenses") by EDWARDS, SANTOS, and others, to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device; ;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to the Target Offenses;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. Firearms, silencers, ammunition, firearm accessories, or materials that could be manufactured into firearms or silencers including but not limited to frames/receivers, upper assemblies, items classified under the National Firearms Act ("NFA"), or materials used in furtherance of the manufacture, use, or otherwise completion of the aforementioned items;

10. Photographs of firearms or silencers; documentation of the purchase, storage, possession, disposition, dominion and control of firearms or silencers, including paperwork and receipts;

11. Records, information, documents, programs, applications, materials, or conversations concerning firearms or silencers trafficking and the remittance of firearms or silencers sales proceeds, to include correspondence, books, receipts, notes, ledgers, notebooks, computer spreadsheets, and other forms of pay/owe sheets, in whatever form;

12. Records, information, documents, programs, applications, materials, or conversations concerning customers or other individuals to whom firearms or silencers may have been distributed;

13. Records of any communications relating to firearms trafficking;

14. Records, information, documents, programs, applications or materials, constituting or concerning correspondence among or between individuals that relate in any way to EDWARDS, SANTOS, or any other individuals purchasing, acquiring, selling, shipping, or transferring firearms or silencers;

15. Records, information, documents, programs, applications or materials, containing photographs and/ or videos depicting illegal use and possession of firearms or silencers;

16. Receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all terrain vehicles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the illegal sale of firearms.

17. Records of travel in furtherance of the unlawful distribution of firearms; and

18. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds, of up to five personal effects for each individual.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the **SUBJECT DEVICE 1** contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

_____

## **ATTACHMENT A-2**

### **Location to be searched (SUBJECT PREMISES)**

**SUBJECT PREMISES** is single family located at 392 Newhall Street, New Haven, Connecticut. The residence is a two-story residence and is occupied by PARIS HUCKABY.



**ATTACHMENT B-2**

**DESCRIPTION OF ITEMS TO BE SEIZED**

**(SUBJECT PREMISES – 392 Newhall Street, New Haven, Connecticut)**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use of which is or has been used as the means of committing a criminal offense, namely, violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) ("Target Narcotics Offenses") including:

a. Any USPS parcels and their contents, or other USPS packaging;

b. Fentanyl, residue of fentanyl, methamphetamine, cocaine, residue of cocaine; and any other controlled substances or items appearing to be controlled substances;

c. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol, mannite, vitamin B-12, inositol, etc.;

d. books, records, receipts, notes, ledgers, lease agreements and other papers and documentation establishing the residence of 392 Newhall Street, New Haven, Connecticut;

e. currency related to the sale of illegal narcotics;

f. books, records, receipts, notes, ledgers, and other papers and documentation relating to the communication, orders and processing, storage, transportation, payment, acquisition and/or distribution of narcotics;

g. Firearms, ammunition, magazines, holsters, gun storage boxes or safes, firearm cleaning kits, or documentation showing possession or use of a firearm (e.g., manuals, receipts);

h. cellular telephones, mobile telephone bills and address books and any other records or document reflecting the telephone numbers.

i. addresses or telephone numbers in books, papers, cellular telephones, tablets or computers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and communications to or from their associates and/or clients in firearms trafficking activity and/or narcotics distribution, suppliers of firearms, firearms parts and/or tools and equipment used in the manufacture of firearms;

37

photographs and videotapes of participants and associates in narcotics distribution activities.

j.  safes and other secure storage containers and their contents; and

k.  identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.

## **ATTACHMENT A-3**

### **PERSON TO BE SEARCHED**

The Target Person to be searched is PARIS HUCKABY, who was born on 10/25/1999, and is depicted in the following photograph:



The search of HUCKABY shall include any and all clothing and personal belongings, backpacks, briefcases, purses, and bags that are within HUCKABY's immediate vicinity and control at the location where the search warrant is executed.

## ATTACHMENT B-3

## DESCRIPTION OF THINGS TO BE SEIZED

All records and information pertaining to violations of federal law, specifically, violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Narcotics Offenses") by HUCKABY, EDWARDS, and others, to include the following, as they relate to the above-listed offenses:

a. Evidence of the Target Narcotics Offenses described above;

b. All bank records, checks, credit card bills, account information, financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

c. Indicia of residency and ownership;

d. U.S. Currency;

e. Cellular telephones;

### USE OF BIOMETRIC DATA TO UNLOCK CELLULAR TELEPHONES

During the execution of the search, law enforcement personnel are specifically authorized to obtain from HUCKABY the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any cellular telephone(s) requiring such biometric access that are subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person's physical biometric characteristics will unlock the cellular telephone(s).

While attempting to unlock the cellular telephone by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the cellular telephone(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person for the password to any cellular telephone(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any cellular telephone(s), the agents will not state or otherwise imply that the warrant requires the

41

person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

---

**ATTACHMENT A-4**

**Property to be Searched (SUBJECT DEVICE 2)**

Cellular device assigned phone number (860) 268-6533 ("**SUBJECT DEVICE 2**") which is being utilized by Paris HUCKABY.

This warrant authorizes the forensic examination of the **SUBJECT DEVICE 2** for the purpose of identifying the electronically stored information described in Attachment B-4.

**ATTACHMENT B-4**

Description of Things to Be Seized (**SUBJECT DEVICE 2**)

All records and information contained in the **SUBJECT DEVICE 2** pertaining to violations of federal law, specifically, violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Narcotics Offenses") by HUCKABY, EDWARDS, and others, to include the following, as they relate to the above-listed offenses:

1. The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

2. Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

3. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above described offenses;

4. Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

5. Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. Saved searches, locations, and route history in the memory of the Device; and Internet browsing history, including internet searches in the memory of the Device; and

8. Postal records or records of travel in furtherance of the unlawful distribution of narcotics.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said

stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the **SUBJECT DEVICE 2** contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

—————————————————

## ATTACHMENT A-5

### Property to be Searched (SUBJECT DEVICE 3)

Cellular device assigned phone number (203) 506-6272 ("**SUBJECT DEVICE 3**"), which is being utilized by Paris Huckaby.

This warrant authorizes the forensic examination of the **SUBJECT DEVICE 3** for the purpose of identifying the electronically stored information described in Attachment B-5.

## ATTACHMENT B-5

Description of Things to Be Seized (**SUBJECT DEVICE 3**)

All records and information contained in the **SUBJECT DEVICE 3** pertaining to violations of federal law, specifically, violations of 21 U.S.C. §§ 841(a)(1) (Distribution of Narcotics, Possession with Intent to Distribute Narcotics); 846 (Conspiracy to Distribute and Possess with Intent to Distribute Narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Narcotics Offenses") by HUCKABY, EDWARDS, and others, to include the following, as they relate to the above-listed offenses:

9. The telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with the Device;

10. Call logs and histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of the Device;

11. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above described offenses;

12. Records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

13. Information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

14. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

15. Saved searches, locations, and route history in the memory of the Device; and Internet browsing history, including internet searches in the memory of the Device; and

16. Postal records or records of travel in furtherance of the unlawful distribution of narcotics.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said

stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the **SUBJECT DEVICE 3** contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.